# BURNS & HARRIS

### ATTORNEYS AT LAW
### THE WOOLWORTH BUILDING
### 233 BROADWAY, SUITE 900
### NEW YORK, NEW YORK 10279
### TEL: (212) 393-1000

SETH A. HARRIS

JEAN M. PRABHU
ALISON R. KEENAN
JOEL A. HOROWITZ
CHRISTOPHER J. DONADIO
ANDREA V. BORDEN

FACSIMILE
(212) 267-2110

KATHERINE M. BURNS
LEE MICHAEL HUTTNER
OF COUNSEL

September 27, 2010

MICHAEL A. CARDOZA
Corporation Counsel, City of New York
100 Church Street
New York, NY 10279

Att: Rachel Seligman Weiss, Esq.
        Senior Counsel
        Special Federal Litigation Division

Pelz & Walker, Esqs.
Attorneys for Defendant
Estate of Michael Pigott
222 Broadway
New York, NY 10038

Re: Olga Negron v. City of New York
     09CV00944 (SLT)(SMG)

Dear Counselors:

With reference to the above matter, enclosed is Plaintiff's Memorandum of Law in Opposition to Defendants' Motions to Dismiss and Declaration of Alison R. Keenan, which is to be submitted to the Court.

We are in possession of the original Affirmation. If you need the original, please advise and we will forward to you.

Yours very truly,

BURNS & HARRIS

BY: ALISON R. KEENAN

jdm

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
OLGA NEGRON, as Administrator of
the Estate of IMAN MORALES, Deceased       09 CV 00944(SLT)(SMG)
and OLGA NEGRON, Individually,
                       Plaintiff,

      -against-


THE CITY OF NEW YORK, P.O. NICHOLAS
MARCHESONA (Tax. Reg. #921535), and
Administrator of the Estate of LT.
MICHAEL W. PIGOTT(Shield # Unknown),
Deceased,
                      Defendants.
-------------------------------------------------------------X


### PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO MOTIONS TO DISMISS BY DEFENDANTS CITY OF NEW YORK AND P.O. NICHOLAS MARCHESONA AND BY DEFENDANT LT. MICHAEL W. PIGOTT


Burns & Harris, Esqs.
Attorneys for Plaintiff
Olga Negron, as
Administrator of the
Estate of Iman Morales,
Deceased, and Olga
Negron, Individually
233 Broadway, Suite 900
New York, NY 10279
(212) 393-1000

Of Counsel
Alison Keenan

## TABLE OF CONTENTS

Page

Table of Authorities……………………………………………...   ii

Preliminary Statement…………………………………………...   1

Statement of Facts………………………………………………   2
     Witness statements………………………………………   3
     NYPD's Patrol Guides and Orders………………………   6

Standard for Dismissal…………………………………………   8

Argument
     Point I: Plaintiffs' §1983 claim is viable; the allegations
     establish a violation of the Fourth Amendment's
     restriction against excessive use of force………………...   10

     Point II: Defendants are not entitled to qualified
     immunity………………………………………………   18

     Point III: Plaintiffs adequately pled a cause of action
     for municipal liability on the §1983 claim………………   21

     Point IV: Plaintiffs adequately alleged a claim for
     assault and battery and for negligent infliction of
     emotional distress………………………………………   23

Conclusion………………………………………………………   25

# TABLE OF AUTHORITIES

## Federal Cases

Ashcroft v. Iqbal, 129 S.Ct. 1937 [2009]...................................................... 8

Beaver, 507 F.Supp 2d at 1144 .............................................................. 13

Bell Atlantic Corp. v, Twombly, 550 US 544 [2007]................................. 8

Brower v. County of Inyo, 489 US 593 [1989] ........................................ 10

Brown v. City of Golden Valley, 574 F.3d 491 [8th Cir. 2009]................ 13

Bryan v. McPherson, 590 F.3d 767 [9th Cir. 2009] ....................... 14, 16, 19

Calamia v. City of New York, 879 F.2d 1025 [2d Cir. 1989] .................... 19

Carr v. Tatangelo, 338 F.3d 1259 [11th Cir. 2003] ................................. 12

Chambers v. Time Warner, Inc., 282 F.3d 147 [2d Cir. 2002]................... 8

City of Canton v. Harris, 489 US 378 [1989] .................................... 22, 23

Deorle v. Rutherford, 272 F.3d 1272 [9th Cir. 2001] ....................... 14, 15, 19

Duke v. Cleland, 5 F.3d 1399 [11th Cir. 1993] ........................................ 8

Glowczenski v. Taser International Inc., 2010 U.S. Dist. LEXIS 47129
   [E.D.N.Y. 2010]........................................................................ 13

Gomez v. City of New York, 2008 U.S. Dist. LEXIS 41455 [S.D.N.Y. 2008] ........... 24

Graham v. Connor, 490 US 386 [1989] ............................................ 10, 18

Harlow v. Fitzgerald, 457 US 800, 73 L.Ed. 2d 396, 102 S. Ct. 2727 [1982]............ 18

Hishon v. King & Spalding, 467 US 69 [1984] ........................................ 8

Jennis v. Rood, 2009 U.S. App. LEXIS 3230 [2d Cir. 2009]........................ 8

Jennis v. Rood, 310 Fed. Appx. 439 [2d Cir. 2009] ................................. 16

Landis v. Baker, 515 F. Supp.2d 809 [E.D. Michigan 2007],
   aff'd by 2008 U.S. App. LEXIS 21946 [6th Cir. 2008] .......................... 20

Lewis v. Downey, 581 F.3d 467 .......................................................... 13

Maiorano v. Santiago, 2005 US Dist. LEXIS 40879 [M.D. Fla. 2005]............ 20

McCall v. Williams, 2010 U.S. Dist. LEXIS 86120 [M.D. Alabama 2010] ................................. 11

McKenzie v. The City of Milpitas, 738 F.Supp. 1293 [N.D. California 1990] ........................... 22

Oliver v. Fiorino, 586 F.3d 898 [11th Cir. 2009] ..................................................................... 12

Orsak v. Metropolitan Airports Commission Airport Police Department,
    675 F.Supp.2d 944 [Minnesota 2009] .................................................................... 13, 20

Ricciuti v. NYC Transit Authority, 124 F.3d 123 [2d Cir. 1997] ................................................ 18

Robison v. Via, 821 F.2d 913 [2d Cir. 1987] ........................................................................... 20

Rodriguez v. Comas, 888 F.2d 899 [1st Cir. 1989] ................................................................... 18

Russo v. City of Cincinnati, 953 F.2d 1036 [6th Cir. 1992] ....................................................... 16

Schreiner v. City of Gresham, 681 F.Supp. 2d 1270 [Oregon, 2010] ........................................ 11

Smith v. County of Saratoga, 1996 U.S. Dist. LEXIS 16319 [NDNY 1996] ............................... 19

Tennessee v. Garner, 471 US 1 [1985] .............................................................................. 11, 22

Terry v. Ohio, 392 US 1 , n.16 [1968] ..................................................................................... 10

Thomas v. Roach, 165 F.3d 137 [2d Cir. 1999] ................................................................. 16, 18

United States of America v. Praisner, 2010 U.S. Dist. LEXIS 84086
    [Connecticut 2010] ........................................................................................................ 19

Williams v. Atkins, 333 F.Supp.2d 209 [S.D.N.Y. 2004] ......................................................... 21

Wilson v. Taser Int'l.,Inc., 303 Fed. Appx. 708 [11th Cir. 2008] .............................................. 13

Wood v. Ostrander, 879 F.2d 583 [CA9 1989] ........................................................................ 10

**State Cases**

Bovsun v. Sanperi, 61 NY2d 219 [1984] .................................................................................. 24

Hass v. Manhattan and Bronx Surface Transit Operating Authority, 204 AD2d 208
    [1st Dept. 1994] .............................................................................................................. 24

**Federal Statutes**

28 USC §1446 ........................................................................................................................... 2

42 USC §1983 .................................................................................................................. passim

## **Federal Rules**

Fed. R. Civ. P. 56 ................................................................................................ 8

Fed.R.Civ.P. 12 ................................................................................................... 1

Fed.R.Civ.P. 12(d) ............................................................................................. 8

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
OLGA NEGRON, as Administratror of
the Estate of IMAN MORALES, Deceased                    09 CV 00944(SLT)(SMG)
and OLGA NEGRON, Individually,
                                    Plaintiff,

        -against-

THE CITY OF NEW YORK, P.O. NICHOLAS
MARCHESONA (Tax. Reg. #921535), and
Administrator of the Estate of LT.
MICHAEL W. PIGOTT(Shield # Unknown),
Deceased,
                                    Defendants.
-------------------------------------------------------------X

## PRELIMINARY STATEMENT

        This Memorandum of Law is in opposition to the motion to dismiss made by defendants The

City of New York ("City") and P.O. Nicholas Marchesona ("Marchesona") (collectively referred to

herein as the "City defendants") pursuant to Rule 12 of the Federal Rules of Civil Procedure.[1]  This

Memorandum of Law is also in opposition to the motion to dismiss made by defendant Susan Pigott,

the Executrix of the Estate of deceased, Lt. Michael Pigott (s/h/a the "Administrator") pursuant to

Rule 12 of the Federal Rules of Civil Procedure.

        Plaintiffs commenced this action in the Supreme Court of the State of New York, County of

Kings on or about February 24, 2009.  In the complaint, plaintiffs asserted a 42 USC §1983 claim.

Plaintiffs alleged constitutional violations by defendants, including the use of excessive force in

violation of the Fourth Amendment as well as a violation of the Fourteenth Amendment.  Plaintiffs

also asserted State claims, including common law negligence, loss of enjoyment of life, assault and

---

[1] The City defendants seek, in the alternative, summary judgment pursuant to Rule 56.  Defendants request an opportunity to submit a 56.1 statement of undisputed facts and any additional supplemental documents should this Court convert the dismissal motion to one for summary judgment.  Plaintiffs' opposition papers address the alternative relief sought by the City defendants.

1

battery, and wrongful death; in addition, claims of loss of consortium and negligent infliction of

emotional distress were alleged on behalf of plaintiff Olga Negron.  This matter was removed to the

Eastern District of New York pursuant to 28 USC §1446.

## STATEMENT OF FACTS

In the complaint (annexed to Keenan Declaration as Exhibit A), plaintiffs alleged the

following facts with regard to the incident:

On September 24, 2008, plaintiff decedent Iman Morales was unreasonably tasered and killed and thereby deprived of his rights, life, liberties and freedoms under color of State Law in violation of 42 USC §1983 (See, Ex. A, ¶23);

Defendant Pigott improperly issued an order to use a Taser on plaintiff decedent (See, Ex. A, ¶24);

Defendant Marchesona failed to give a warning to plaintiff/decedent prior to using the Taser (See, Ex. A, ¶26);

Defendant Marchesona failed to use his Taser as a "last resort" (See, Ex. A, ¶27);

Defendants improperly used a Taser on the plaintiff decedent and did so in a situation when the plaintiff decedent could fall from an elevated surface (See, Ex. A, ¶¶ 28, 29, and 32);

Plaintiff decedent presented no threat of imminent death or serious physical injury to himself or others (See, Ex. A, ¶ 30, 33);

Plaintiff decedent did not commit any illegal act either before or at the time he was improperly detained and tasered and killed (See, Ex. A, ¶40);

Plaintiff decedent was deprived of the right to be free guaranteed to him by the Fourteenth Amendment to the United States Constitution and as a result, was caused to suffer injury, damage and wrongful death (See, Ex. A, ¶34);

Plaintiff was deprived of his right not to be subjected to excessive force by police that caused his loss of life guaranteed to him by the Fourth Amendment to the United States Constitution (See, Ex. A, ¶35); and

Defendant officers, in violation of 42 USC 1983, detained the plaintiff decedent even though the defendants knew or should have known that plaintiff decedent was wholly innocent (See, Ex. A, ¶36).

With regard to the City of New York, plaintiffs alleged:

The City failed to hire, train, supervise, etc. officers in the exercise of their functions and that their failure to enforce the laws of the State of New York and City of New York was carried out negligently, willfully, maliciously and with such reckless disregard for the consequences so as to display a conscious disregard for the dangers of harm and injury to citizens, including plaintiff decedent (See, Ex. A, ¶39); and

Although defendants knew or should have known of the  fact that this pattern of conduct was carried out by their agents/employees, the City has not taken any steps or made any efforts to halt this course of conduct (See, Ex. A, ¶42).

Witness statements[2]

Mr. Morales had a history of suffering from schizophrenia and bipolar disorder. He had HIV as well as Hepatitis B. According to Ms. Negron, Mr. Morales' mother, Mr. Morales was taking a new medication which can make him "crazy". He had been going in and out of hospitals for psychiatric treatment. Ms. Negron went to meet Mr. Morales at his apartment on September 24, 2008 to take him to a scheduled psychiatric appointment. However, when she arrived, he would not open the door for her. Mr. Morales told her that the appointment was canceled. Ms. Negron called the police out of her concern for her son. (See, Investigating Officer's Report of Olga Negron dated September 24, 2008, annexed to Keenan Declaration as Exhibit B.)

Police officers responded to the call and went to the address where Mr. Morales was located at 489 Tompkins Avenue, County of Kings, City and State of New York. Police officers assigned to the Emergency Service Unit (ESU), including P.O. Marchesona, assisted in restraining Mr. Morales. According to P.O. Marchesona, when he arrived at the scene, there were other patrol officers from the command at the scene as well as a patrol supervisor. P.O. Marchesona observed Mr. Morales leaning out of the third floor window. Mr. Morales was naked and yelling at individuals on the street. Another officer radioed that they were on a barricaded EDP (Emotionally Disturbed Person) job which required the response of additional personnel. At least four more ESU officers responded to the scene. P.O. Marchesona was carrying a Taser. (See, Internal Affairs Bureau Investigating Officer's Report concerning the hearing of PO Marchesona, dated October 30, 2008, annexed to the City defendants' Declaration as Ex. C.)

Mr. Morales's apartment door was tied closed by the police officers to prevent him from exiting. Mr. Morales, who was on the fire escape at this point, had attempted to gain entry into

---

[2] We refer to witness statements as the City defendants rely on witness statements in support of their motion and in the event this Court converts the dismissal motion to one for summary judgment.

another tenant's apartment through the window. According to P.O. Marchesona, when Mr. Morales observed ESU personnel through the window of this other tenant's apartment, he ran down the fire escape to the lowest level. The barricaded EDP job was now determined to be a potential "jumper" job. (See, Internal Affairs Bureau Investigating Officer's Report concerning the hearing of PO Marchesona, dated October 30, 2008, annexed to the City defendants' Declaration as Ex. C.)

Detective Sullivan and P.O. Zajac were making their way down the fire escape toward Mr. Morales. Both Detective Sullivan and P.O. Zajac had themselves clipped or harnessed onto the fire escape to keep from falling. Mr. Morales moved himself from the fire escape ladder onto the roll down security gate adjacent to it and had acquired a fluorescent light bulb tube in his hand. (See, Internal Affairs Bureau Investigating Officer's Report concerning the hearing of PO Marchesona, dated October 30, 2008, annexed to the City defendants' Declaration as Ex. C.) Mr. Morales "prodded" Detective Sullivan in the buttocks a couple of times with the light bulb. (See, Internal Affairs Bureau Investigating Officer's Report concerning a PG hearing of Det. Sullivan, annexed to Keenan Declaration as Exhibit D.)

Meanwhile, Lt. Pigott asked P.O. Marchesona if he had a Taser, to which he responded that he did. Lt. Pigott told P.O. Marchesona to taser Mr. Morales. P.O. Marchesona centered the laser of the Taser on Mr. Morales and without issuing any kind of warning, P.O. Marchesona pulled the trigger until the Taser stopped cycling on its own.[3] Mr. Morales froze up after he was struck with the Taser leads. He fell from the top of the roll down gate, which was approximately ten feet and five inches from the ground. Mr. Morales fell straight down to the ground and landed on his head. (See, Internal Affairs Bureau Investigating Officer's Report concerning the hearing of PO Marchesona, dated October 30, 2008, annexed to the City defendants' Declaration as Ex. C.)

_____

[3] The Internal Affairs Bureau Investigating Officer's Report, dated September 25, 2008, states that the Taser Model M26 had been discharged three times on September 24, 2008. (Annexed to Keenan Declaration as Ex. F)

P.O. Marchesona claimed that after discharging the Taser, he called to P.O. Zajac to grab Mr. Morales. However, P.O. Marchesona acknowledged that he was aware that in order for P.O. Zajac to grab Mr. Morales, he would have had to first unhook his harness from one side to try to get close enough to grab Mr. Morales. P.O. Marchesona also acknowledged that Officer Zajac would only have had five seconds to do this. (See, Internal Affairs Bureau Investigating Officer's Report concerning the hearing of PO Marchesona, dated October 30, 2008, annexed to the City defendants' Declaration as Ex. C.)

The Internal Affairs Bureau Investigating Officer's Report, dated September 24, 2008, concerning the interview of P.O. Zajac, provides that Officer Zajac wore a harness while on the fire escape and was hooked with an emergency line onto the fire escape. Notably, he did not hear any orders or directions being given to Mr. Morales before he was tasered and did not hear any ESU supervisors give him directions.[4] (Annexed to Keenan Declaration as Exhibit E.)

The Internal Affairs Bureau Investigating Officer's Report, dated September 25, 2008, concerning the hearing of Detective Sullivan provides that Detective Sullivan was clipped to the fire escape with a harness and that he felt someone "prodding him with what he later learned was a light bulb".[5] He heard the cycling of a Taser device. He also did not hear any verbal commands prior to the use of the Taser. He saw Mr. Morales stand rigid on the cover of the roll down gate and fall over. (Annexed to Keenan Declaration as Exhibit D.) Following this incident, Lt. Pigott was placed on Modified Assignment.

---

[4] P.O. Zajac's statement that he heard no directions being given to him directly contradicts defendants' argument that P.O. Marchesona called to the officers on the fire escape to grab plaintiff decedent.

[5] While defendants continually state that Mr. Morales "struck" officers with the light bulb in an attempt to create the impression that there was imminent harm, we submit that this is a misleading and inaccurate description of what occurred. According to Det. Sullivan, one of the officers on the fire escape, he only felt "prodding" with what he later learned was a light bulb. This is a far cry from being "struck".

We also refer this Court to the witness statement of Vanessa Jennings, who was interviewed on October 2, 2008. She stated that she observed a Hispanic male naked and standing on the awning of a building. The male was holding a fluorescent light bulb and pointing the bulb at a police officer who was standing on the fire escape above the male. She stated that the male "poked"[6] the light bulb at the rear end of the police officer on the fire escape and that the police officer told the male to stop and attempted to grab the light bulb from the male's hand. She stated that she then saw the light bulb fall to the ground and break. During the incident, she heard several people in the crowd yelling for the officers to get a bed or net. She observed an officer on the ground fire the Taser gun and strike the male; she believes he was struck three times. She observed the male fall to the ground and land on his right side and head. (Annexed to Keenan Declaration as Exhibit C)

NYPD's Patrol Guides and Orders

The New York City Police Department, Patrol Guide, entitled, "Hostage/Barricaded Person(s)", issued on September 1, 2000, provides that officers should "attempt to slow the pace of the incident", "refrain from any action that would unnecessarily jeopardize the safety", and that "Deadly physical force will be used only as a last resort to protect the life of persons present". (Annexed to Keenan Declaration as Exhibit K.)

The New York City Police Department, Patrol Guide, entitled "Mentally Ill or Emotionally Disturbed Persons", issued on March 17, 2000, provides that the purpose is to "safeguard" a mentally ill or emotionally disturbed person. It further provides that the "safety of All persons involved is paramount in cases involving emotionally disturbed persons". "Physical force will be used ONLY to the extent necessary to restrain the subject…" and that "Deadly physical force will be used ONLY as a last resort to protect the life of the uniformed member of the service assigned or any other person present". When an aided is isolated/contained but will not leave voluntarily, the patrol supervisor is

---

[6] Being "poked" is also a far cry from being "struck".

to employ non-lethal devices to ensure the safety of all present.  (Annexed to Keenan Declaration as Exhibit J.)

An Interim Order from the New York City Police Department, issued June 4, 2008, on the subject of "Use of Conducted Energy Devices (CED)", provides that prior to using a CED, the member of service should consider the "totality of the circumstances" when deciding the minimum amount of force necessary to overcome resistance.  It provides that an authorized uniformed member of service should "Issue an appropriate warning, consistent with personal safety, to the intended subject and other members of service present prior to discharging the CED". [Emphasis added] It further provides that the "CED should not be used…in situations where the subject may fall from an elevated surface".  [Emphasis added]  (Annexed to Keenan Declaration as Exhibit G.)

The Taser International manual, which covers the M26, provides that the taser causes temporary incapacitation and an inability to catch yourself as you fall.  "This incapacitation and the resulting fall can be dangerous and even fatal under specific circumstances".  (Annexed to Keenan Declaration as Exhibit H.)

The New York Police Department Guidelines on the "Use of Force" provides that only the minimum amount of force is used to accomplish a lawful mission and that the use of that force be reasonable and necessary.  Under the section concerning "Deadly Physical Force", it provides that "Only that amount of force necessary to overcome resistance will be used to effect an arrest to take a mentally ill or emotionally disturbed person into custody. Deadly physical force will be used ONLY as a last resort…".  Some warning, such as a verbal warning, must be given before shooting at another person.  With regard to Tasers, it provides that the Taser creates electro-muscular disruption to electronically immobilize the individuals by stunning and overriding the central nervous system causing involuntary muscle contractions.  The attacker loses control of his/her sensory and motor

7

nervous system and he or she will fall to the ground. Up to 50,000 volts of electrical current can be transferred to the attacker. If a current is being sent to an attacker and an assisting officer touches the tasered person between the probes or the probe wires, then "they too will have an electrical surge pass into his body…". (Annexed to Keenan Declaration as Exhibit I.)

## STANDARD FOR DISMISSAL

On a motion to dismiss, the plaintiffs' allegations must be accepted as true. See, Hishon v. King & Spalding, 467 US 69 [1984]; see also, Chambers v. Time Warner, Inc., 282 F.3d 147 [2d Cir. 2002]; and Jennis v. Rood, 2009 U.S. App. LEXIS 3230 [2d Cir. 2009]. The complaint must be construed in plaintiff's favor. See, Duke v. Cleland, 5 F.3d 1399 [11th Cir. 1993]. Where there are "well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to entitlement to relief". See, Ashcroft v. Iqbal, 129 S.Ct. 1937 [2009]. "To survive a motion to dismiss, a complaint need not contain 'detailed factual allegations,' but instead the complaint must contain 'only enough facts to state a claim to relief that is plausible on its face'". See, Bell Atlantic Corp. v, Twombly, 550 US 544 [2007].

With regard to defendants' reference to materials outside the pleadings in support of their dismissal motions, "it is well established that when materials outside the pleadings are offered upon a motion to dismiss, 'a district court should adhere strictly to the language of [Federal] Rule [of Civil Procedure] 12(b).' In such circumstances, 'a district court must either exclude the additional material and decide the motion on the complaint alone or convert the motion to one for summary judgment under Fed. R. Civ. P. 56 and afford all parties the opportunity to present supporting material.' [Cits.]" See, Terranova v. State of New York, 2005 U.S. App. LEXIS 15535 [2d Cir. 2005]; see also, *Fed.R.Civ.P. 12(d)*.

In the instant action, the City defendants annex documents in addition to the pleadings. Specifically, the City defendants annex Investigating Officer's Reports from the Internal Affairs Bureau as well as Complaint-Follow Up Informational Reports. These reports contain hearsay statements from purported witnesses and more importantly, includes information beyond the allegations in the pleadings. Defendant Pigott also relies on matters outside the pleadings, including the video footage of the incident and the NYPD Patrol Guide 212 Series, Interim Order No. 20 (dated June 4, 2008).

The reference to these documents is improper on a motion to dismiss and should not be considered. However, as the City defendants seek summary judgment in the alternative and should this Court opt to consider these documents, we ask that this Court also consider the affidavit of plaintiffs' expert, Lieutenant Richard Greene, a retired New York City Police Officer (annexed to Keenan Declaration as Exhibit L), as well as the witness statements, patrol guides, and NYPD Interim Order annexed to plaintiffs' Declaration in Opposition to defendants' motions. Plaintiffs also request, as do the City defendants, an opportunity to submit a statement of undisputed facts and any additional supplemental documents should this motion be converted to one for summary judgment.

## ARGUMENT

### POINT I:
### PLAINTIFFS' §1983 CLAIM IS VIABLE; THE ALLEGATIONS
### ESTABLISH A VIOLATION OF THE FOURTH AMENDMENT'S
### RESTRICTION AGAINST EXCESSIVE USE OF FORCE

General law regarding §1983 claims and the Fourth Amendment

"To sustain an action under section 1983, a plaintiff must show (1) that the conduct complained of was committed by a person acting under color of state law; and (2) that the conduct deprived the plaintiff of a federal constitutional or statutory right [cits.]." See, Wood v. Ostrander, 879 F.2d 583, 587 [CA9 1989].

The Fourth Amendment guarantees citizens the right to be "secure in their persons…against unreasonable…seizures" of the person. See, Graham v. Connor, 490 US 386 [1989]. A seizure occurs "when government actors have 'by means of physical force or show of authority,…in some way restrained the liberty of a citizen,' Terry v. Ohio, 392 US 1, 19, n.16 (1968); see Brower v. County of Inyo, 489 US 593, 596 [1989]". Graham v. Connor, supra at 455.[7]

"Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake". Id. at 455.

In the instant case, the allegations in the complaint clearly make out a Fourth Amendment violation. It is alleged that: plaintiff decedent was unreasonably tasered and killed and thereby deprived of his rights, life, liberties and freedoms under color of State Law in violation of 42 USC §1983 (See, Ex. A, ¶23); defendant Pigott improperly issued an order to use a taser on plaintiff

---

[7] We discuss the Fourth Amendment as that is the focus of defendants' motions to dismiss. We maintain that in addition to a Fourth Amendment violation, there was also a Fourteenth Amendment constitutional violation in this case.

decedent (See, Ex. A, ¶24); defendant Marchesona failed to use his Taser as a "last resort" (See, Ex. A, ¶27); defendants improperly used a Taser on the plaintiff decedent and did so in a situation when the plaintiff decedent could fall from an elevated surface (See, Ex. A, ¶¶ 28, 29, and 32); plaintiff decedent presented no threat of imminent death or serious physical injury to himself or others (See, Ex. A, ¶ 30, 33); plaintiff decedent did not commit any illegal act either before or at the time he was improperly detained and tasered and killed (See, Ex. A, ¶40); plaintiff decedent was deprived of his right not to be subjected to excessive force by police that caused his loss of life guaranteed to him by the Fourth Amendment to the United States Constitution (See, Ex. A, ¶35); and defendant officers, in violation of 42 USC 1983, detained the plaintiff decedent even though the defendants knew or should have known that plaintiff decedent was wholly innocent (See, Ex. A, ¶36).

The above allegations, taken as true, clearly establish a Fourth Amendment violation and a viable §1983 claim.

Mr. Morales was "seized" within the meaning of the Fourth Amendment

"A person…does not have to be arrested in order to be seized under the Fourth Amendment. A person can be seized under the Fourth Amendment when a law enforcement officer terminates an individual's freedom of movement through means intentionally applied". McCall v. Williams, 2010 U.S. Dist. LEXIS 86120 [M.D. Alabama 2010].

"A Fourth Amendment seizure occurs when there is 'an intentional acquisition of physical control' and in light of all the circumstances, 'a reasonable person would have believed that he was not free to leave'". See, Schreiner v. City of Gresham, 681 F.Supp. 2d 1270, 1276 [Oregon, 2010]. As the Supreme Court of the United States stated in Tennessee v. Garner, 471 US 1 [1985], "Whenever an officer restrains the freedom of a person to walk away, he has seized that

11

person…there can be no question that apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment."

The use of a Taser gun or other gun on an individual prior to arrest/restraint has been held to constitute a seizure and has been analyzed under the Fourth Amendment. See, McCall v. Williams, supra; see also, Oliver v. Fiorino, 586 F.3d 898, 901 [11th Cir. 2009][Excessive force claim concerning use of Taser gun prior to arrest analyzed under Fourth Amendment]; Carr v. Tatangelo, 338 F.3d 1259 [11th Cir. 2003][Plaintiff "seized" within meaning of Fourth Amendment even though plaintiff was not immediately stopped by bullet from officer's gun].[8]

In the instant action, Lt. Pigott and P.O. Marchesona as well as the other officers at the scene of the incident plainly intended to acquire control over Mr. Morales and a reasonable person would not have felt free to leave even before Mr. Morales was tasered. The police officers had already closed off access to the doors of plaintiff's apartment building by tying the doors closed to prevent Mr. Morales from leaving. Moreover, the fact that Mr. Morales was walking along the fire escape and was standing on a roll down gate demonstrates that he did not feel free to walk away. There can be no question that Mr. Morales was "seized" within the meaning of the Fourth Amendment.

The use of the Taser gun on Mr. Morales constituted excessive force

We submit that the use of the Taser gun on Mr. Morales was excessive. Defendants used deadly force when there was no threat of imminent death or serious injury. Mr. Morales had committed no crime; his conduct did not warrant a number of responding officers coming after him as if he was a criminal. Holding a fluorescent light bulb and "poking" or "prodding" Det. Sullivan in the buttocks a couple of times did not pose an "immediate threat to the safety of the officers or others". Det. Sullivan was in no real danger as he was on the fire escape above Mr. Morales and was

---

[8] This case law dispels of defendant Pigott's argument that plaintiff was not "seized" within the meaning of the Fourth Amendment.

clipped onto the fire escape with the use of a harness. Mr. Morales's actions did not warrant the response of deadly force used against him.

We point out that Tasers have been recognized by the Courts as causing excruciating pain. The United States District Court for the District of Minnesota held that the "taser is 'designed to cause significant, uncontrollable muscle contractions capable of incapacitating even the most focused and aggressive combatants' [cit.]". See, Orsak v. Metropolitan Airports Commission Airport Police Department, 675 F.Supp.2d 944 [Minnesota 2009]. "The taser gun …'transmits electrical pulses along the wires and into the body of the target'…Those electrical pulses occur at a rate of approximately twelve pulses per second…The pulses cause immobilization, disorientation, loss of balance, and weakness.  When used successfully, a taser renders an individual incapacitated, disoriented, and unable to move…". Id. at 957-958. Tasers deliver a 50,000 volt charge. See, Brown v. City of Golden Valley, 574 F.3d 491 [8th Cir. 2009].

"The Seventh Circuit noted that 'one need not have personally endured a taser jolt to know the pain that must accompany it.' Lewis v. Downey, 581 F.3d 467 [7th Cir. 2009); see also Beaver, 507 F.Supp 2d at 1144 ('[I]t is…undeniable that being 'tased' is a painful experience'). A state trooper who volunteered to be shot with a taser during taser training described the pain as "unbelievable'. Wilson v. Taser Int'l.,Inc., 303 Fed. Appx. 708, 710 (11th Cir. 2008)…" See, Orsak v. Metropolitan Airports Commission Airport Police Department, supra at 958.

In a case quite similar to the one herein, Glowczenski v. Taser International Inc., 2010 U.S. Dist. LEXIS 47129 [E.D.N.Y. 2010], this Court held that factual issues were raised as to whether the use of a Taser on an emotionally disturbed person constituted excessive force.  The Glowczenski case arises out of the death of plaintiff-decedent, a 35 year-old man with a history of schizophrenia as well as a history of arrests for violent behavior, including striking and kicking a police officer.  Mr.

13

Glowczenski's violent history was known to the police department. On the date of the incident which was the subject of the case, the police department received a 911 call from plaintiff-decedent's mother saying that he was having a "psychotic episode". He was also supposed to go to the doctor that day, but "he just took off". A non-party witness testified that she heard plaintiff-decedent standing outside a school and saw him "stumbling and yelling and screaming incoherently" and "looked crazed". Police officers arrived at the school and told plaintiff-decedent that he had to go to the hospital to get help. When plaintiff-decedent began to back away, an officer grabbed his arm. He pulled away and then came into contact with another officer who fell to the ground. Another officer then grabbed the back of plaintiff's shirt and swept both of his legs from left to right to put him on the ground. Plaintiff decedent was lying on the ground, face down, and then plaintiff was tasered multiple times in rapid succession. Pepper spray was also used on plaintiff as plaintiff continued to struggle violently. As in the instant case, plaintiff decedent in Glowczenski died as a result of the force used against him. Plaintiffs claimed that his death was a homicide in police custody. Plaintiffs asserted excessive force claims among other claims. Defendants moved for summary judgment. Under these facts, this Court held that the excessive force claim will go to the jury.

We submit that the instant case is stronger as the Taser was used on Mr. Morales while he was standing on an elevated surface. This constituted deadly force as it was predictable that he would fall a distance to the concrete ground and no provisions were made for his safety. The instant case is also stronger as Mr. Morales had no violent history, unlike plaintiff-decedent in the Glowczenski case.

The handling of EDPs was specifically addressed in Deorle v. Rutherford, 272 F.3d 1272 [9th Cir. 2001] and Bryan v. McPherson, 590 F.3d 767, 778 [9th Cir. 2009]. In Deorle v. Rutherford,

14

supra, plaintiff's wife called the police when plaintiff became suicidal and began screaming and banging on the walls of the house after learning that he had been diagnosed with Hepatitis C. Police officers responded. Plaintiff lifted a wooden board from the porch railing on his house and also brandished a hatchet at a police officer. However, he dropped both at the officer's command. Plaintiff had also lifted a crossbow, but discarded it. Then plaintiff walked directly toward the officer "at a steady gate [sic]". At that point, the officer fired a "less lethal" "beanbag round" into plaintiff's face. Plaintiff was unarmed when shot and had committed no serious offense. No warning was given that he would be shot. Plaintiff lost his eye as a result of the shooting. The Court held that the officer "could easily have avoided a confrontation, and awaited the arrival of the negotiating team by retreating to his original position behind the roadblock". Plaintiff had committed no crime; at most, he could be charged with nothing more than obstructing the police in the performance of their duties. There was no immediate need to subdue plaintiff even though there was evidence that plaintiff walked toward the officer with a can or bottle in his hand and the Court held that this was insufficient to justify the force deployed.

The Ninth Circuit in Deorle stated the following in handling emotionally disturbed persons:

"The problems posed by, and thus the tactics to be employed against, an unarmed, emotionally distraught individual who is creating a disturbance or resisting arrest are ordinarily different from those involved in law enforcement efforts to subdue an armed and dangerous criminal who has recently committed a serious offense. In the former instance, increasing the use of force may...exacerbate the situation; in the latter, a heightened use of less-than-lethal force will usually be helpful...In the case of mentally unbalanced persons, the use of officers and others trained in the art of counseling is ordinarily advisable, where feasible, and may provide the best means of ending a crisis...Even when an emotionally disturbed individual is 'acting out' and inviting officers to use deadly force to subdue him, the governmental interest in using such force is diminished by the fact that the officers are confronted, not with a person who has committed a serious crime against others, but with a mentally ill individual...we emphasize that where it is or should be apparent to the officers that the individual involved is emotionally disturbed, that is a factor that must be considered in determining, under Graham, the reasonableness of the force employed." See, Deorle v. Rutherford, supra at 1282-1283.

As pointed out in Bryan v. McPherson, supra:

"A mentally ill individual is in need of a doctor, not a jail cell, and in the usual case…the government's interest in deploying force to detain him is not as substantial as its interest in deploying that force to apprehend a dangerous criminal.  Moreover, the purpose of detaining a mentally ill individual is not to punish him, but to help him.  The government has an important interest in providing assistance to a person in need of psychiatric care; thus, the use of force that may be justified by that interest necessarily differs in both degree and in kind from the use of force that would be justified against a person who has committed a crime or who poses a threat to the community".

In the instant action, we submit that Mr. Morales was not handled properly and the use of force against him was not justified.  We point out that the use of Tasers has been held to either constitute excessive force or, at the very least, raise a triable issue of fact.  See, Bryan v. McPherson, supra [Deployment of Taser on plaintiff not justified and excessive, even though plaintiff exhibited unusual behavior including yelling gibberish and hitting his thighs and officer testified that plaintiff took step toward him]; Russo v. City of Cincinnati, 953 F.2d 1036 [6th Cir. 1992][Issue of fact regarding whether use of Taser on potentially homicidal and suicidal individual holding a knife in each hand and making threatening statement to officers constituted excessive force].

We also point out that the fact that plaintiff in the instant case was holding a light bulb did not justify the force used on him.  See, Cerbelli v. City of New York, 2008 U.S. Dist. LEXIS 109341 [EDNY 2008]; Thomas v. Roach, 165 F.3d 137 [2d Cir. 1999][Issue of fact regarding excessive use of force on plaintiff who threatened to set house on fire where plaintiff was shot, even though plaintiff held knife and rock and hands]; and Jennis v. Rood, 310 Fed. Appx. 439 [2nd Cir. 2009][Facts alleged sufficiently state excessive force claim where plaintiff was shot four times, even though officers determined that plaintiff committed robbery and was holding axe down by his side, which plaintiff refused to drop despite officer's requests].

In Cerbelli, supra, plaintiff decedent, a paranoid schizophrenic, entered a police precinct while high on cocaine. He was brandishing a knife at officers and hit one of the officers hard on the

16

back.  One of the officers fired a Taser at decedent.  All officers fired gun shots at decedent at the same time to protect a fallen officer.  This Court held that there were disputed issues of fact as to whether some of the officer's actions in shooting the decedent were objectively reasonable, even though decedent was holding a knife and running towards other officers.

In this case, where plaintiff had committed no crime, was mentally ill, and did not pose a threat of serious injury or death to others, the use of the Taser on him as he was standing on an elevated surface without providing for his safety was not objectively reasonable and was excessive.

Findings of Lieutenant Richard Greene (Annexed to Keenan Declaration as Ex. L)

We refer this Court to the findings of Lieutenant Richard Greene in the event this motion is converted to a summary judgment motion or this Court considers the alternative relief sought by the City defendants.  Lt. Greene opined that that under the circumstances of this matter, Lt. Pigott improperly issued an order to use a Taser on Mr. Morales and P.O. Marchesona improperly tasered Mr. Morales.  He opined that Mr. Morales' death was predictable as he was shot with the Taser while standing on an elevated surface over a concrete ground with no provisions made to ensure his safety after falling.   According to Lt. Greene, Mr. Morales should have been treated and handled differently.  Mr. Morales should not have been treated like a felon, as was done in this matter.

Lt. Greene opined that Lt. Pigott and P.O. Marchesona used deadly force in restraining Mr. Morales.  Lt. Greene stated that while a Taser is typically considered a less-lethal device, when a Taser is used on an individual who is standing on an elevated surface, the force is lethal.  He refers to the Interim Order from the New York City Police Department, issued June 4, 2008, on the subject of "Use of Conducted Energy Devices (CED)", which provides that the "CED should not be used…where the subject may fall from an elevated surface".[9]  [Emphasis added]   He opined that P.O. Marchesona failed to use his taser as a "last resort" and that Det. Sullivan was not under threat

---

[9] This provision dispels of any argument by defendants that they did not violate NYPD's rules.

of serious injury or imminent death. He also stated that it was improper to discharge the taser with

issuing a warning first.

Based upon the facts and circumstances of this matter and in accordance with the case law

cited above, the allegations in the complaint sufficiently set forth a §1983 claim involving a Fourth

Amendment violation. Plaintiffs adequately alleged that excessive force was used on plaintiff. In the

event this motion is converted to one for summary judgment, it is respectfully submitted that there is

ample evidence to, at the very least, raise a triable issue of fact as to whether the force deployed by

defendants was excessive.

### POINT II:
### DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY

General law regarding qualified immunity defense

As the United States Court of Appeals for the Second Circuit stated in Thomas v. Roach,

supra:

> "The doctrine of qualified immunity shields police officers acting in their official capacity
> from suits for damages under 42 USC §1983, unless their actions violate clearly-established
> rights of which an objectively reasonable official would have known.  See, Harlow v.
> Fitzgerald, 457 US 800, 818, 73 L.Ed. 2d 396, 102 S. Ct. 2727 (1982); Ricciuti v. NYC
> Transit Authority, 124 F.3d 123, 127 (2d Cir. 1997)." Thomas v. Roach, supra at 142.

The Second Circuit in Thomas v. Roach went on to state:

> "Overcoming qualified immunity entails a two-part process.  First, a plaintiff must allege the
> violation of a clearly-established constitutional or statutory right.    Second, qualified
> immunity will be denied only if a reasonable official should have known that the challenged
> conduct violated that established right.  See Rodriguez v. Comas, 888 F.2d 899, 901 (1st Cir.
> 1989).  In measuring 'reasonableness,' we consider the  facts and circumstances of each
> particular case, including the crime committed, its severity, the threat of danger to the officer
> and society, and whether the suspect is resisting or attempting to evade arrest. See Graham v.
> Connor, 490 US 386, 396, 104 L.Ed. 2d 443, 109 S.Ct. 1865 (1989)…". Thomas v. Roach,
> supra at 142-143.

In addressing the qualified immunity defense on an excessive force claim, the Second Circuit

noted that "The right of an individual not to be subjected to excessive force has long been clearly

established." See, <u>Calamia v. City of New York</u>, 879 F.2d 1025 [2d Cir. 1989]. See, also <u>Smith v. County of Saratoga,</u> 1996 U.S. Dist. LEXIS 16319 [NDNY 1996].

In determining whether an officer's conduct violated a "clearly established statutory or constitutional right", it has been uniformly held that the fact that there is no direct legal precedent dealing with the same set of facts is not dispositive. See, <u>Bryan v. McPherson</u>, supra [9[th] Cir. 2009][Officer who deployed Taser against plaintiff during traffic stop not entitled to qualified immunity even where plaintiff was yelling and hitting his thighs and officer stated that plaintiff took "one step" toward him; fact that there was no direct legal precedent did not affect outcome]; see also, <u>Deorle v. Rutherford</u>, supra; <u>United States of America v. Praisner</u>, 2010 U.S. Dist. LEXIS 84086 [Connecticut 2010][Officers can be on notice of violation of clearly established law even in "novel factual circumstances"].

Defendants' argument that there was a dearth of case law in the Second Circuit on the use of Tasers is without merit. It has been held that "although there is no prior case prohibiting the use of …specific type of force in precisely the circumstances here involved, that is insufficient to entitle…to qualified immunity…Otherwise, officers would escape responsibility for the most egregious forms of conduct simply because there was no case on all fours prohibiting that particular manifestation of unconstitutional conduct. When the 'defendant['s] conduct is so patently violative of the constitutional right that reasonable officials would know without guidance from the courts' that the action was unconstitutional, closely analogous pre-existing case law is not required to show that the law is clearly established.'…It does not matter that no case of this court directly addresses the use of such weapons; we have held that 'an officer is not entitled to qualified immunity on the grounds that the law is not clearly established every time a novel method is used to inflict injury…". See, <u>Deorle v. Rutherford</u>, supra at 1285-1286.

See also, Orsak v. Metropolitan Airports Commission Airport Police Department, 675 F. Supp. 2d 944 [Minnesota 2009][Reasonable officer would be on notice that use of Taser on bicyclist charged with several misdemeanor offenses violated clearly established constitutional rights, even where very act in question has not been previously held to be unlawful]; Maiorano v. Santiago, 2005 US Dist. LEXIS 40879 [M.D. Fla. 2005][Although there are no cases with facts materially similar, it should still be obvious to an objectively reasonable officer that the use of a Taser on plaintiff because plaintiff was engaged in physical altercation with another student violated plaintiff's right to be free from use of excessive force].

Indeed, the Second Circuit has looked to case law from other Districts Courts and other Circuits to determine whether there was a clearly established constitutional right.  See, Robison v. Via, 821 F.2d 913 [2d Cir. 1987].

The dearth of case law on Taser use was specifically addressed in Landis v. Baker, 515 F. Supp.2d 809 [E.D. Michigan 2007], aff'd by 2008 U.S. App. LEXIS 21946 [6th Cir. 2008]. In Landis, decedent drowned after struggling with officers, having his head submerged in muddy water, and being tasered five times.  In determining whether the use of the Taser violated a clearly established constitutional right, the district court drew a parallel between Tasers and pepper spray as there was a dearth of case law on the issue of Taser use. As it had been held that the unwarranted use of pepper spray constituted excessive force and violated a clearly established constitutional right, the Court held that this line of reasoning extends equally to the use of Tasers.  The Court held that the case law concerning the use of pepper spray served as sufficient notice that the unwarranted and improper use of a Taser can constitute excessive force in violation of a clearly established constitutional right.

<u>Defendants violated a clearly established constitutional right and a reasonable</u>
<u>officer would not find defendants' conduct to be lawful</u>

In the instant case, it is alleged that plaintiff did not commit any illegal act either before or at the time he was improperly detained, tasered, and killed. It is also alleged that plaintiff presented no threat of imminent death or serious physical injury. Plaintiffs alleged that defendant Marchesona failed to use his Taser as a "last resort" and that defendants improperly used a Taser on the plaintiff decedent and did so in a situation when the plaintiff decedent could fall from an elevated surface. Under the facts alleged and in accordance with the case law cited above, there can be no question that the use of the Taser on plaintiff violated a clearly established constitutional right and was unlawful.

There is also no question that a reasonable officer would not find defendants' conduct to be lawful. The NYPD issued an Interim Order specifically stating that Tasers are not to be used on individuals standing on elevated surfaces. Without being repetitive, we refer this Court to the NYPD guidelines regarding: the handling of EDPs, the use of CEDs, and the use of force. We also refer this Court to the findings of Lt. Richard Greene in the event this motion is converted to one for summary judgment.

With regard to the argument that P.O. Marchesona was following the order of Lt. Pigott, it is established that "all law enforcement officers have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." See, <u>Williams v. Atkins</u>, 333 F.Supp.2d 209, 214 [S.D.N.Y. 2004].

**POINT III:**
**PLAINTIFFS ADEQUATELY PLED A CAUSE OF ACTION**
**FOR MUNICIPAL LIABILITY ON THE §1983 CLAIM**

Plaintiffs alleged an inadequacy of police training as well as practice and policy, in part, as the basis for municipal liability. The City defendants argue that plaintiffs have failed to make a sufficient assertion of practice or policy. In response thereof, we submit that the complaint does,

indeed, sufficiently plead a §1983 claim against the City. With regard to "practice or policy", we

refer this Court to Paragraph 42 of the complaint, which alleges as follows:

> "Although defendants knew or should have known of the fact that this pattern of conduct was
> carried out by their agents, servants and/or employees, the defendant City of New York has
> not taken any steps or made any efforts to halt this course of conduct, to make redress to the
> plaintiff or other citizens injured thereby, or to take any disciplinary action whatever against
> any of their employees or agents."

This allegation, taken together with the other allegations in the complaint, adequately alleges

a pattern of conduct, a practice, which led to the deprivation of plaintiff's constitutional rights.

With regard to inadequate training and deliberate indifference, the complaint adequately

alleges a claim in this regard as well. It has been held that "the inadequacy of police training may

serve as the basis for §1983 liability only where the failure to train amounts to deliberate indifference

to the rights of persons with whom the police come into contact." City of Canton v. Harris, 489 US

378 [1989]. "It may happen that 'the need for more or different training is so obvious, and the

inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city

can reasonably be said to have been deliberately indifferent to the need.' City of Canton, 109 S.Ct. at

1205; see also, Tennessee v. Garner, 471 US 1 [1985][the need to train officers in use of deadly force

is 'so obvious' that failure to do so could be characterized as 'deliberate indifference' to

constitutional rights]. See, McKenzie v. The City of Milpitas, 738 F.Supp. 1293, 1300-1301 [N.D.

California 1990][Plaintiff entitled to present §1983 claim against municipality to jury for alleged

condoned use of excessive force and alleged improper training].

In Maiorano v. Santiago, supra, an officer deployed a Taser on plaintiff because of plaintiff's

physical altercation with another student. Plaintiff alleged that as a result of the policy decisions of

the police department's "use of force" policy, plaintiff suffered severe injuries. Defendants argued

that plaintiff failed to allege how such policy or custom caused plaintiff's injury. The Court held that

22

"Defendants ultimately are urging the Court to apply heightened pleading requirements to this case. However, general standards of notice pleading apply to claims under 42 USC Section 1983 (cit.). Therefore, the Court finds that plaintiff has stated a claim for relief against the Orange County Sheriff." [Emphasis added]

The Maiorano case dispels of the City defendants' argument that plaintiffs do not identify any specific deficiency in training with regard to the use of Tasers.  See also, Glowczenski v. Taser International Inc., supra [ "claim of inadequate training will trigger liability when 'the failure to train amounts to deliberate indifference to the rights' of those with whom the municipal employees come into contact. See, City of Canton v. Harris, 489 US 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 [1989]."]

In the instant action, plaintiffs have adequately pled a cause of action for municipal liability pursuant to the §1983 claim. We refer this Court to ¶¶ 39 and 42 of the complaint.

With regard to the City's argument that the City cannot be deliberately indifferent to rights that are not clearly established, we refer this Court to our argument set forth in Point II establishing that defendants did, indeed, violate a clearly established constitutional right.

### POINT IV
### PLAINTIFFS ADEQUATELY ALLEGED A CLAIM FOR ASSAULT AND BATTERY AND FOR NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

Assault and Battery Claim

"Under New York law, to succeed in an action sounding in assault, a plaintiff must establish that a defendant 'intentional[ly] plac[ed]…another person in fear of imminent harmful or offensive contact. (cits.)"  See, Cerbelli v. City of New York, 2008 US Dist. LEXIS 109341 [EDNY 2008]. "Battery requires a plaintiff to demonstrate '(1) bodily contact, which is (2) harmful or offensive in nature, and (3) made with intent (cits.)".  See, Cerbelli v. City of New York, supra.

In Cerbelli v. City of New York , supra, referred to earlier in our papers, which involves a mentally ill man who was high on cocaine when he entered a police precinct brandishing a knife and making forceful contacts with an officer and who was tasered and shot at by several police officers, plaintiff asserted an excessive force claim in addition to state claims of assault and battery. Defendants moved for summary judgment on all claims. The Court held that there were disputed issues of fact regarding both claims as it applied to certain officers. The Cerbelli case refutes the argument of the City defendants that the assault and battery claims are duplicative of plaintiff's Fourth Amendment excessive force claim. These are separate claims with separate charges and different predicate factors. See also, in Gomez v. City of New York, 2008 U.S. Dist. LEXIS 41455 [S.D.N.Y. 2008][Defendants' summary judgment motion with regard to the State claims for assault and battery as well as the claim of excessive force denied.]

Negligent infliction of emotional distress claim

On this claim, plaintiffs alleged that Olga Negron was compelled to witness her son being abused when defendants improperly used a Taser on him and caused him to sustain a wrongful death. Plaintiffs also alleged that Ms. Negron was in the "zone of danger".

These allegations suffice to establish a negligent infliction of emotional distress claim. See, Bovsun v. Sanperi, 61 NY2d 219 [1984]["…where a defendant negligently exposes a plaintiff to an unreasonable risk of bodily injury or death, the plaintiff may recover, as a proper element of his or her damages, damages for injuries suffered in consequence of the observation of the serious injury or death of a member of his or her immediate family…"]; see also, Hass v. Manhattan and Bronx Surface Transit Operating Authority, 204 AD2d 208 [1st Dept. 1994][Plaintiff who witnessed daughter's fatal accident was entitled to damages on emotional distress claim; rule applies even where plaintiff's shock or fright is not due to fear for own safety, but for safety of child].

The City defendants argue that a photograph of the incident shown in a newspaper article, annexed in support of their dismissal motion as Ex. H, shows that Ms. Negron was not exposed to the risk of injury or death. However, we submit that this photograph represents a split second of the events and does not reveal Ms. Negron's whereabouts at the time of the actual fall.

## CONCLUSION

For the forgoing reasons, plaintiffs respectfully request that the motions of the City defendants as well as of defendant Pigott be denied in their entirety.

**Dated: New York, New York**
**September   , 2010**

 

                               **Respectfully,**

                               **Burns & Harris**
**By:**                            
                               **Alison Keenan (ARK 6366)**
                               **Attorneys for Plaintiffs**
                               **233 Broadway, Suite 900**
                               **New York, NY 10279**
                               **(212) 393-1000**

**AFFIDAVIT OF SERVICE**

JUDI DE MARCO, being duly sworn, deposes and says: I am not a party to this action, am over the years of eighteen years and reside in Old Bridge, NJ.

That on the 27TH day of September, 2010 I served a true copy of the annexed:

**PLAINTIFF'S MEMORANDUM OF LAW**

---

By mailing same in a sealed envelope by regular mail with postage prepaid, in an official depository of the United States Postal Service within the State of New York, upon the following:

MICHAEL A. CARDOZA
Corporation Counsel
City of New York
100 Church Street
New York, NY 10279

Att: Rachel Seligman Weiss, Esq.
      Senior Counsel
      Special Federal Litigation Division

Pelz & Walker, Esqs.
Attorneys for Defendant
Estate of Michael Pigott
222 Broadway
New York, NY  10038

JUDI DE MARCO

Sworn to before me
September 27, 2010

NOEMI CEDENO
Notary Public, State of New York
No. 01CE6058994
Qualified in New York County
Commission Expires May 21, 20___ //

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------------x
OLGA NEGRON, as Administratrix of the Estate of
IMAN MORALES, Deceased  and OLGA NEGRON,
Individually

                                 Plaintiff

           Against

THE CITY OF NEW YORK,
P.O. NICHOLAS MARCHESONA (Tax Reg. #921535),
And Administrator of the Estate of LT. MICHAEL. W.
PIGOTT (Shield # unknown), Deceased

                               Defendants
-----------------------------------------------------------------------------x

09CV00944
(SLT)(SMG)

---

## PLAINTIFF'S MEMORANDUM OF LAW

---

**BURNS & HARRIS, ESQS.**
**Attorneys for Plaintiff**
**Office & P. O. Address**
**233 Broadway, Suite 900**
**New York, NY  10279**
**212 393-1000**
**Fax: 212 267-2110**