UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

----------------------------------------------------------------- x

OLGA NEGRON, as Administrator of the            :
Estate of IMAN MORALES, Deceased                :
and OLGA NEGRON, Individually,                  :
                                                :
                    Plaintiff,                  :
                                                :            MEMORANDUM &
        -against-                               :            ORDER
                                                :            09-Civ-0944 (SMG)
THE CITY OF NEW YORK, P.O. NICHOLAS             :
MARCHESONA, and Administrator of the Estate of  :
LT. MICHAEL W. PIGOTT,                          :
                                                :
                    Defendants.                 :
                                                :
----------------------------------------------------------------- x

*Gold, S., United States Magistrate Judge:*

## INTRODUCTION

Plaintiff Olga Negron brings this action individually and as administratrix of the estate of

her deceased son, Iman Morales.  Plaintiff asserts claims pursuant to 42 U.S.C. § 1983 and state

law against the City of New York ("the City"), Police Officer Nicholas Marchesona, and the

estate of Lieutenant Michael Pigott.  Complaint ("Compl.), Docket Entry 1.  Plaintiff's lawsuit

stems from a series of events that occurred on September 24, 2008 and culminated in Officer

Marchesona, pursuant to an order from Lt. Pigott, deploying a taser against Morales.  Def. 56.1

¶¶ 31-32, 36.  Once struck by the taser, Morales fell from an elevated position, landed on his

head, and died.  Def. 56.1 ¶¶ 39, 41.

On October 19, 2012, United States District Judge Sandra L. Townes granted defendants'

motion to dismiss plaintiff's § 1983 municipal liability claim against the City, plaintiff's § 1983

substantive due process claim under the Fourteenth Amendment against all defendants, and

plaintiff's state law claim for negligent infliction of emotional distress against all defendants.

Docket Entry 63.  The parties subsequently consented to the assignment of this case to me for all purposes including entry of final judgment.  Docket Entry 69.

Plaintiff's remaining claims are brought pursuant to § 1983 for excessive force under the Fourth Amendment against the individual defendants Marchesona and Pigott and pursuant to state law against all defendants for assault and battery, common law negligence, loss of enjoyment of life, wrongful death, and loss of consortium.  Defendants now move for summary judgment dismissing each of these remaining claims.[1]  Docket Entries 74-75.  The primary question raised by defendants' motion is whether Pigott and Marchesona are entitled to qualified immunity.  For the reasons outlined below, I conclude that they are not.

## FACTUAL BACKGROUND[2]

On September 24, 2008, defendant Marchesona and his partner, members of the Emergency Services Unit ("ESU") of the New York City Police Department ("NYPD"), received a request to respond to Tompkins Avenue where police were already dealing with an Emotionally Disturbed Person ("EDP") barricaded in his apartment.  Def. 56.1 ¶¶ 1, 2.  The EDP was plaintiff Negron's son, Iman Morales, who suffered from schizoaffective disorder and was having a psychotic episode.  *Id.* ¶¶ 3, 4.  Upon arriving at the Tompkins Avenue address, Marchesona observed Morales leaning out the window of his apartment, shirtless, and shouting at people on the street below.  *Id.* ¶ 12.  Marchesona was informed by a local precinct officer

---

[1] Defendant Pigott joins in the arguments made by the City and Marchesona.  *See* Notice of Mot., Docket Entry 74, at 1; Defendant Michael Pigott Mem. Supp. Mot. Summ. J. 12 ("Pigott Mem."), Docket Entry 74-1; Letter of July 12, 2013, Docket Entry 88.

[2] Unless otherwise noted, facts are undisputed.  I draw from the following: Defendant's Statement Pursuant to Local Civil Rule 56.1 ("Def. 56.1"), Docket Entry 77; Plaintiff's Response to Defendant's Statement of Undisputed Material Facts ("Pl. 56.1 Resp.") and Local Rule 56.1(b) Statement of Additional Facts ("Pl. 56.1(b)"), Docket Entry 81; and Defendants' Response to Plaintiff's Rule 56.1(b) Statement of Additional Facts ("Def. 56.1(b) Resp."), Docket Entry 85.  In addition, supporting evidentiary materials were submitted as exhibits to the following: Declaration of Elizabeth Krasnow, May 10, 2013 ("Krasnow Decl.), Docket Entry 76; Declaration of Christopher J. Donadio, June 19, 2013 ("Donadio Decl."), Docket Entry 81-2; Declaration of Alexander Peltz, May 1, 2013 ("Peltz Decl."), Docket Entry 74, at 3-26.

already on the scene that Morales had stopped taking his medication and had recently been diagnosed with HIV.  *Id.* ¶¶ 8, 11.  Marchesona's partner then notified Lieutenant Pigott, an ESU supervisor, of the "confirmed barricaded EDP."  *Id.* ¶ 13.

Marchesona and his partner entered the apartment building and ascended to Morales' third floor apartment, but then heard and responded to a fourth-floor tenant shouting that Morales was attempting to break into her apartment.  *Id.* ¶¶ 14, 15.  The officers, now on the fourth floor, observed Morales on the fire escape, naked, attempting to remove the tenant's air conditioner from her window.  *Id.* ¶ 16.  They asked Morales to come inside, but he retreated back down the fire escape instead.  *Id.* ¶¶ 17, 18.  Defendants also represent that, while Morales remained on the fire escape, the crowd on the street began encouraging Morales to jump, *id.* ¶ 22, although this fact is disputed, Pl. 56.1 Resp. ¶ 22.  It is undisputed that, with Morales now on the fire escape, the police reclassified the situation from a "barricaded EDP job" to a potential "jumper job." Def. 56.1 ¶ 19.

By this time, additional ESU officers had arrived and were attempting to speak with Morales from the window of his third-floor apartment.  *Id.* ¶¶ 20, 25.  Two of the ESU officers climbed out onto the fire escape in an attempt to negotiate with Morales.  *Id.* ¶¶ 26, 27. Meanwhile, Marchesona returned to the ground floor of the building where he overheard Lieutenant Pigott asking other ESU officers whether they had a taser.  *Id.* ¶¶ 29, 30.  Marchesona informed Pigott that he had a taser, and Pigott directed him to deploy his taser on Morales.  *Id.* ¶¶ 31, 32.

Morales had by now left the fire escape and was standing on the housing of a roll-down security gate over a store front.  *Id.* ¶ 33.  From this position, Morales was approximately ten feet

above the ground. [3]  Pl. 56.1(b) ¶ 1.  Morales was swinging a five-to-eight-foot-long fluorescent

light bulb in the direction of the ESU officers who were on the fire escape.  *Id.* ¶ 34.

Marchesona centered the taser on Morales and pulled the trigger once.  Def. 56.1 ¶ 36.  The taser

was deployed in "dart mode."  Tr. of Oral Arg., Docket Entry 89, at 23.  As explained in *Cockrell*

*v. City of Cincinnati*, 468 Fed. App'x 491, 492 (6th Cir. 2012), tasers have two modes: "dart

mode" and "drive-stun mode."  In dart mode, a taser discharges metal probes that lodge in the

skin of the target and deliver an electrical shock that overrides the target's central nervous

system.  In drive-stun mode, electrodes are pressed directly upon the target's body delivering a

shock that, while painful, does not have the same incapacitating impact on the target's muscles

and nervous system.  *Id.*; *Mattos v. Agarano*, 661 F.3d 433, 443 (9th Cir. 2011).

　　　Marchesona did not warn Morales of what was about to happen before deploying his

taser, Pl. 56.1(b) ¶ 2, and it appears that no other officer did either.[4]  Marchesona did, however,

call out to the officers on the fire escape and direct them to grab Morales.  Def. 56.1 ¶ 36.  When

struck with the taser, Morales' entire body stiffened; still rigid, he fell forward, landed on his

head, and died.  Def. 56.1 ¶¶ 37, 39, 41.  A few days later, Lieutenant Pigott took his own life at

an ESU facility.  *Id.* ¶ 47.

---

[3] The approximate height above ground at which Morales stood is undisputed.  Pl. 56.1(b) ¶ 1; *see* Krasnow Decl. Ex. B, Marchesona Dep. 27:21-24.  However, while Plaintiff characterizes the ground below as "concrete sidewalk," Pl. 56.1(b) ¶ 1, defendants note that the record does not include any information about the surface underneath Morales.  Def. 56.1(b) Resp. ¶ 1.

[4] It is undisputed that Marchesona did not himself issue a warning.  Pl. 56.1(b) ¶ 2; Def. 56.1(b) Resp. ¶ 2. However, there is a dispute over the extent to which Marchesona can be certain that Morales was not warned by anyone else.  When asked during his deposition, "Did you warn Mr. Morales that you were going to fire the taser?" Marchesona answered, "No," and when then asked, "Did anyone else?" he also replied, "No."  Donadio Decl. Ex. A, Marchonesa Dep. 95:17-25.  Defendants maintain the distinction that "Marchesona did not *hear* any officers warn Morales."  Def. 56.1(b) Resp. ¶ 2 (emphasis added); *see also* Krasnow Decl. Ex. H, Zajac Dep. 48:7-11 (deposition of Detective Robert Zajac, at which he answered "No" to the question: "Did you hear anyone give [Morales] any warning that they were going to taser him?").

The undisputed evidence reveals that neither Marchesona nor Pigott anticipated that Morales would fall head first.  Def. 56.1 ¶¶ 38, 43.  Rather, Marchesona testified at his deposition that Pigott had shared with him that

> he never thought that Mr. Morales would have fell [*sic*] the way he did.  He thought that he maybe would have collapsed.  I mean, coming straight down and possibly, maybe, breaking a leg, but nothing probably worse than that.

Donadio Decl. Ex. A, Marchesona Dep. 27:11-17.  Marchesona likewise expected that

> once the taser stopped working . . . [Morales'] body would release from stiffening up, from being stiff and just crumple, also, crumple down. . . . [m]eaning – because he was frozen up from the electricity going through his body. . . . [then] once the electricity was released . . . his legs would maybe give way.  That's what I mean by crumple down.

Donadio Decl. Ex. A, Marchesona Dep. 28:12-22.

As this testimony indicates, the police anticipated that Morales would likely sustain a serious injury; indeed, they requested an air bag.  Pl. 56.1(b) ¶ 3.  Negron recalls expressing concern to one of the officers, before the taser was used, that her son could get hurt, and asking the officer "where's the mattress."  Krasnow Decl. Ex. C, Negron Dep. 166:22.  According to Negron, the officer responded, "Ma'am, we're waiting.  It's going to be here any minute."  *Id*. at 166:23-25.  Negron's testimony in this regard is corroborated by  one of the officers on the scene, Detective Robert Zajac, who testified that he understood an air mattress was on its way to the scene.  Donadio Decl. Ex. B, Zajac Dep. 62:16-22.  Lieutenant Pigott, though, apparently elected not to wait for the air bag to arrive before instructing Marchesona to use his taser, and it did not arrive until after Morales had fallen.  Pl. 56.1(b) ¶ 3; Donadio Decl. Ex. A, Marchesona Dep. 65:6-15.

The testimony of the officers on the scene regarding the severity and urgency of the threat posed by Morales is not entirely consistent.  After Morales fell, Pigott explained to

Marchesona that, when he directed Marchesona to taser Morales, he feared that the officers on the fire escape could be injured if the light bulb Morales was wielding were to break.  Def. 56.1 ¶ 42.  Marchesona saw the light bulb hit Detective Franklin Sullivan, one of the officers on the fire escape, Def. 56.1 ¶ 35, but he "didn't notice [Sullivan] react in any way" and "didn't necessarily think [Sullivan] was in danger from him getting poked with it," Donadio Decl. Ex. A, Marchesona Dep. 76:21-77:7.  Detective Zajac, who was on the fire escape with Sullivan, estimated that he and Sullivan were approximately five feet from Morales when Marchesona deployed his taser.  Krasnow Decl. Ex. H, Zajac Dep. 41:13-18.  According to Zajac, the detectives could have retreated back up the fire escape if they had chosen to do so.  Donadio Decl. Ex. B, Zajac Dep. 45:8-12.  Zajac further testified that he does not recall fearing for his life at the time, and that he made no attempt to retreat.  Krasnow Decl. Ex. H, Zajac Dep. 43:5-12.

On June 4, 2008, a little more than three months prior to the events described above, the NYPD issued an Interim Order stating that a police officer should give "an appropriate warning, consistent with personal safety," before deploying a taser.  Pl. 56.1(b) ¶ 12; Donadio Decl. Ex. C at 5.  The same Order also directed, "When possible, the [taser] *should not* be used . . . in situations where the subject may fall from an elevated surface."  Pl. 56.1(b) ¶ 13; Donadio Decl. Ex. C at 6 (emphasis in original).

DISCUSSION

A.  Summary Judgment Standard

To prevail on a motion for summary judgment, the moving party must show that "there is no genuine dispute as to any material fact" and that it is therefore "entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  When evaluating the motion, the evidence presented must be viewed in the light most favorable to the party opposing summary judgment, and all

inferences must be drawn in that party's favor.  *See Giannullo v. City of New York*, 322 F.3d 139,

140-41 (2d Cir. 2003) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)); *Maharishi*

*Hardy Blechman Ltd. v. Abercrombie and Fitch Co.*, 292 F. Supp. 2d 535, 540 (S.D.N.Y. 2003);

*see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  Summary judgment may be

granted only if there is no genuine factual dispute; it must be denied "if the dispute about a

material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a

verdict for the nonmoving party."  *Id.* at 248.

B.  <u>Plaintiff's § 1983 Excessive Force Claim</u>

Defendants seek summary judgment dismissing plaintiff's § 1983 claim on the grounds

that the individual defendants, Lieutenant Pigott and Officer Marchesona, are entitled to

qualified immunity.[5]  "[G]overnment officials performing discretionary functions generally are

shielded from liability for civil damages insofar as their conduct does not violate clearly

established statutory or constitutional rights of which a reasonable person would have known."

*Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  An assertion of qualified immunity requires a

court to determine  "(1) whether plaintiff has shown facts making out violation of a

constitutional right; (2) if so, whether that right was clearly established; and (3) even if the right

was clearly established, whether it was objectively reasonable for the officer to believe the

conduct at issue was lawful."  *Gonzalez v. City of Schenectady*, No. 11-5403, 2013 WL 4528864,

at *3 (2d Cir. Aug. 28, 2013) (internal quotation marks omitted).

---

[5] *See* Defendants City of New York and Nicholas Marchesona Mem. Supp. Mot. Summ. J. 3-12 ("City Mem."),
Docket Entry 78; Defendant Michael Pigott Mem. Supp. Mot. Summ. J. 4-5 ("Pigott Mem."), Docket Entry 74-1;
*see also* Defendants City of New York and Nicholas Marchesona Reply Mem. Further Supp. Mot. Summ. J. ("City
Mem. Reply"), Docket Entry 86.  Plaintiff opposes the granting of qualified immunity.  *See* Plaintiff's Mem. Opp.
Mot. Summ. J. 4 ("Pl. Mem."), Docket Entry 81.

1.   *Whether the Police Conduct Violated a Constitutional Right*

Excessive force claims that, like the one asserted here, arise in the context of an arrest or investigatory stop, invoke Fourth Amendment scrutiny based on the "reasonableness" of the challenged law enforcement actions. *Graham v. Connor*, 490 U.S. 386, 393-97 (1989) (holding that "*all* claims that law enforcement officers have used excessive force – deadly or not – in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard," *id.* at 395). Because the Fourth Amendment analysis itself depends upon the reasonableness of the force used, the first and third prongs articulated in *Gonzalez* are applied together.

To determine whether a use of force was reasonable, a court must balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id*. at 396. The test "is not capable of precise definition or mechanical application, . . . [but] requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* (internal citations and quotation marks omitted). As explained recently by a court in this district, the *Graham* inquiry is fact-specific and contextual, and "requires close examination of the totality of the circumstances in each particular case." *Adedeji v. Hoder*, 09-CV-4046 (CBA), 2013 WL 1233501, at *6 (E.D.N.Y. Mar. 27, 2013); *see also Tracy v. Freshwater*, 623 F.3d 90, 96 (2d Cir. 2010). The reasonableness test is an objective one; "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397. In evaluating whether a use

8

of force was objectively reasonable, courts must "embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Id.* at 396-97.

As noted above, Marchesona deployed his taser in "dart mode."  The target of a taser deployed in dart mode experiences a painful electric shock that "instantly overrides the . . . central nervous system, paralyzing the muscles throughout the body, rendering the target limp and helpless," and causing "excruciating pain that radiates throughout the body." *Bryan v. McPherson*, 630 F.3d 805, 824 (9th Cir. 2010).  Accordingly, "the national mainstream of the decisions which have examined the nature and quality of the intrusion" caused by a taser used in dart mode have concluded that it "constitutes an 'intermediate, significant level of force that must be justified by the government interest involved.'" *Id*. at 810 (reiterating the referenced proposition, but withdrawing the quoted opinion, reported at 608 F.3d 614, 621, on other grounds).

Common sense suggests that, in the ordinary case, the likelihood of sustaining serious, permanent injuries from a taser is relatively low; nevertheless, a taser "unquestionably 'seizes' the victim in an abrupt and violent manner," and causes an "intrusion into the interests . . . protected by the Fourth Amendment [that is] quite severe." *Cavanaugh v. Woods Cross City*, 625 F.3d 661, 665 (10th Cir. 2010).  Moreover, particular facts and circumstances, like those here, can heighten the severity of this intrusion.  For example, when a taser is deployed without warning, a person cannot anticipate or prepare for its effects.  *See, e.g.*, *Mattos v. Agarano*, 661 F.3d 433, 451 (9th Cir. 2011) (finding that the failure to warn the target prior to deploying a taser "pushes this use of force far beyond the pale" and "weighs in favor of finding a constitutional

violation"); *Bryan*, 630 F.3d at 831 (noting that an officer's failure to warn before deploying a taser "militate[s] against finding [an officer's] use of force reasonable"). *But see McKenney v. Harrison*, 635 F.3d 354, 360 (8th Cir. 2011) (holding officers were reasonable in discharging a single taser shock, despite their failure to warn). Moreover, and of even greater significance, the risk of serious injury posed by a taser is far greater and the intrusion on an individual's interests is substantially more severe if the target is in a precarious position. For example, the Sixth Circuit found it unreasonable to taser a suspect who was "in a prone position in a muddy swamp" and at obvious risk of drowning. *Landis v. Baker*, 297 Fed. App'x 453, 464 (6th Cir. 2008). Indeed, defendant City of New York has at least implicitly conceded that the taser deployment in this case was a more severe use of force than taser use generally; the NYPD Interim Order cited above instructs that an officer should issue a warning before using a taser, and that, to the extent possible, tasers should not be used "where the subject may fall from an elevated surface." Donadio Decl. Ex. C. Here, of course, no warning was issued, and Morales was ten feet off the ground when Marchesona pulled the taser's trigger.

The United States Supreme Court has emphasized that there is no "easy-to-apply legal test in the Fourth Amendment context . . . in the end we must still slosh our way through the factbound morass of 'reasonableness.'" *Scott v. Harris*, 550 U.S. 372, 383 (2007). Whether the type of force used may properly be categorized as deadly, intermediate or even slight is not dispositive; rather, "all that matters is whether [the officers'] actions were reasonable." *Id.*; *see also Adedeji*, 2013 WL 1233501, at *6 (holding that even "a mere 'nudge'" may constitute a use of force that is unreasonable under particular circumstances). The Ninth Circuit also reminds that "there are no per se rules in the Fourth Amendment excessive force context." *Mattos*, 661 F.3d at 441 (citing *Scott*). As an essential part of the reasonableness inquiry, "we examine the

10

totality of the circumstances and consider 'whatever specific factors may be appropriate in a particular case, whether or not listed in *Graham*.'"  *Mattos*, 661 F.3d at 441.

As noted above, *Graham* requires that the "nature and quality of the intrusion" on Morales' Fourth Amendment rights be balanced against the "countervailing governmental interests at stake."  490 U.S. at 396.  The circumstances of this case could lead a reasonable juror, after weighing these competing concerns, to find that plaintiff's constitutional rights were violated.  First, the intrusion on Morales' Fourth Amendment rights was undoubtedly severe and even life-threatening.  Morales was tasered without warning while standing on a small, unenclosed ledge ten feet off the ground.  Defendant Marchesona has acknowledged that he expected that Morales' legs would give way and that his body would "crumple down."  Donadio Decl. Ex. A, Marchesona Dep. 28:12-22.  Pigott anticipated that Morales would fall "straight down" and that Morales might break a leg, "but nothing probably worse than that."  *Id*. at 27:11-17.  Given the height at which Morales was standing and the precarious nature of his perch, even the significant risk of the fatal result that ensued could reasonably have been foreseen.

Certainly, the law enforcement officers on the scene had a legitimate interest in preventing Morales from fleeing or harming himself or others.  Marchesona and Pigott were aware that Morales was having a psychotic episode and acting erratically.  Def. 56.1 ¶¶ 3, 12, 16.  They witnessed Morales naked and shouting on the fire escape of his building, and apparently attempting to enter a neighbor's apartment from the fire escape by removing an air conditioner from her window.  *Id.* ¶¶ 12, 16.  Morales also led officers on a chase to the fire escape, repeatedly disobeying police orders to return to the inside of the apartment, and he eventually began swinging a long fluorescent light bulb at officers harnessed to the fire escape.  *Id.* ¶¶ 17-18, 26-29, 33-34.  When Pigott ordered that Morales be tasered, he was concerned that the light

11

bulb would break and shatter glass over the officers on the fire escape.  *Id.* ¶ 42.  When

Marchesona deployed the taser, Morales was still wielding the light bulb and was swinging it

very close to one of the officers on the fire escape.  *See* Krasnow Decl. Ex. I, at NYC 546.

Although there was some risk that Morales could injure officers with the light bulb, the

evidence, construed most favorably to plaintiff, provides little reason to believe that any injury

Morales might have inflicted would be at all serious.  Although Marchesona states that Pigott

expressed fear that broken glass might have injured an officer's eye, Marchesona Dep. 27:4-9,

this fear seems to have been based on speculation and was only raised after Morales had fallen to

his death.  Certainly the officers on the fire escape were above Morales, and it appears that the

faces of the officers were out of the bulb's reach.  *See* Krasnow Decl. Ex. I, at NYC 546.  Under

these circumstances, a jury might reasonably dismiss this as nothing more than a post-hoc

rationalization formulated after the tragic aftermath of the taser's discharge.

Moreover, there were viable alternatives available to the police that could have avoided

or at least minimized the risk to officers.  Morales' movement was limited and his options few,

as he was trapped in a small area atop the awning.  *Id.* ¶ 33-34.  The light bulb was only

conceivably dangerous to those in the immediate vicinity; the officers in reach could have

retreated from harm's way, as one of them testified.  Zajac Dep. 45:8-12.  Instead of deploying

the taser immediately, Marchesona presumably could have aimed the taser at Morales, ready to

fire if the situation escalated further.  The police might also have waited for the arrival of the air

bag that had been requested and was likely only a few minutes away.  *See* Pl. 56.1(b) ¶ 3; Negron

Dep. 166:20-25; Marchesona Dep. 65:6-15.  Another factor relevant to assessing the use of force

in this case is that Morales, while apparently emotionally disturbed, had not committed a serious

or dangerous crime:

> Even when an emotionally disturbed individual is 'acting out' and inviting
> officers to use deadly force to subdue him, the governmental interest in using such
> force is diminished by the fact that the officers are confronted, not with a person
> who has committed a serious crime against others, but with a mentally ill
> individual.

*Deorle v. Rutherford*, 272 F.3d 1272, 1283 (9th Cir. 2001).  Generally, even a legitimate

"[d]esire to resolve quickly a potentially dangerous situation is not the type of government

interest that, standing alone, justifies the use of force that may cause serious injury."  *Id.* at 1281.

For all these reasons, and considering the evidence in the light most favorable to plaintiff,

a reasonable finder of fact could conclude that the risk of serious injury to Morales was

substantial and outweighed the government's interest in subduing him, and that the decision to

taser Morales therefore violated his Fourth Amendment rights.

### 2.  *Whether the Constitutional Right Violated Was Clearly Established*

Even if their actions are found to have constituted unreasonable or excessive force,

Marchesona and Pigott would still be entitled to qualified immunity if, at the time Pigott directed

Marchesona to taser Morales, "the law . . . did not clearly establish that the officer's conduct

would violate the Constitution."  *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004).  Generally,

whether qualified immunity applies to the conduct of a law enforcement officer is a question of

law for the court to decide.  *Stephenson v. Doe*, 332 F.3d 68, 80-81 (2d Cir. 2003).

The determination of whether conduct violates constitutional rights that are clearly

established "must be undertaken in light of the specific context of the case, not as a broad general

proposition."  *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  The Supreme Court in *Saucier*

continued by pointing out that

> there is no doubt that *Graham v. Connor, supra,* clearly establishes the general
> proposition that use of force is contrary to the Fourth Amendment if it is

13

excessive under objective standards of reasonableness.  Yet that is not enough.
Rather, . . . the right the official is alleged to have violated must have been
'clearly established' in a more particularized, and hence more relevant sense: The
contours of the right must be sufficiently clear that a reasonable official would
understand that what he is doing violates that right.

*Id.* at 201-02 (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).  In other words, just

because it is clearly established that excessive force violates the Constitution "does not mean that

is always clear *which* uses of force" violate the Constitution.  *Casey v. Federal Heights*, 509 F.3d

1278, 1284 (10th Cir. 2007).

Fair warning clearly establishing that conduct is unconstitutional may emanate only from

"Supreme Court and Second Circuit precedent existing at the time of the alleged violation."

*Moore v. Vega*, 371 F.3d 110, 114 (2d Cir. 2004) (citing *Townes v. City of New York*, 176 F.3d

138, 144 (2d Cir. 1999).  As defendants correctly note, City Mem. 7, there were no Supreme

Court or Second Circuit decisions regarding excessive force and involving the use of a taser at

the time of the events at issue here.[6]

Yet "officials can still be on notice that their conduct violates established law even in

novel factual circumstances."  *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).  In other words, the

precise factual pattern at issue in a particular case need not have been ruled upon in a prior

decision for it to be clear that an officer's conduct violated a constitutional right.  As the

Supreme Court has explained, "We do not require a case directly on point, but existing precedent

must have placed the statutory or constitutional question beyond debate."  *Ashcroft v. Al-Kidd*,

131 S. Ct. 2074, 2083 (2011).  Applying this standard, the Sixth Circuit found the use of pepper

spray to be sufficiently similar to deployment of a taser for pepper spray cases to provide a

---

[6] Other circuit courts that had weighed in on the issue had held that, under the circumstances presented in
the cases before them, did *not* constitute excessive force.  *See, e.g.*, *Draper v. Reynolds*, 369 F.3d 1270, 1278 (11th
Cir. 2004); *Hinton v. City of Elwood, Kansas*, 997 F.2d 774, 781-82 (10th Cir. 1993).  In addition, one district court
in the Second Circuit had found that police reasonably used a taser on a suspect who was resisting arrest and
attempting to flee.  *U.S. ex rel. Thompson v. Vill. of Spring Valley*, 2006 WL 1889912, at *4 (S.D.N.Y. July 10,
2006).

14

source of relevant clearly established law: "Even without precise knowledge that the use of the taser would be a violation of a constitutional right, the officers should have known based on analogous cases that their actions were unreasonable." *Landis v. Baker*, 297 Fed. App'x 453, 463 (6th Cir. 2008). Similarly, in a recent decision from this district, *Adedeji v. Hoder*, 09-CV-4046 (CBA), 2013 WL 1233501 (E.D.N.Y. Mar. 27, 2013), qualified immunity was denied despite the lack of precedent involving similar facts.

Pigott and Marchesona should have known that using a taser under the particular circumstances at issue here was unreasonable even despite the lack of precedent involving tasers used under similar circumstances. *Graham* did not merely announce that excessive force claims are properly analyzed under the Fourth Amendment, or that whether a particular use of force is reasonable depends upon a balancing of the degree of intrusion on the individual's rights against the governmental interests at stake. *Graham* also identified specific factors to be taken into account when undertaking this balancing, including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." 490 U.S. at 396; *see also Tracy*, 623 F.3d at 96. Morales had not committed a serious or violent crime. He did not pose an immediate threat to the safety of officers or others; he did not have a traditional weapon – a gun or a knife – but instead was holding only a long light bulb, and the officers closest to him could have retreated to a position out of reach of the bulb while still blocking Morales from fleeing. In fact, Morales was surrounded and could not flee. While passively resisting arrest by refusing to obey the officers' instructions, Morales was not actively resisting by fighting or struggling with the officers or attempting to escape. Finally, additional officers were on their way to the scene

15

with an air mattress that presumably would have safely broken Morales' fall, and there was no pressing reason not to await their arrival.

Any concern that it would be unjust to deny qualified immunity given the scant precedent outlining when taser use constitutes an unreasonable use of force is mitigated by the NYPD policy adopted several months before the events in issue.  That policy, at a minimum, should have alerted the defendant officers to the severe dangers of using a taser, without warning, on an individual who could fall from an elevated and precarious position, and informed their consideration of the *Graham* factors.

For all these reasons, and construing the evidence of the relevant facts and circumstances in the light most favorable to plaintiff, I conclude that a reasonable jury could find facts that would, under clearly established law, constitute a violation of Morales' Fourth Amendment rights, and that would render it objectively unreasonable for Pigott and Marchesona to have believed that their conduct was lawful.  Defendants' motion for summary judgment with respect to plaintiff's Section 1983 claim is therefore denied.

C.  State Law Claims

The second, third and both fourth causes of action alleged in the complaint assert claims under state law on behalf of Morales' estate for assault and battery, negligence, loss of enjoyment of life, and wrongful death.[7]  The fifth and sixth causes of action are brought by Negron on her own behalf and assert claims for loss of consortium and for having witnessed her son's wrongful death.  As noted above, plaintiff's sixth cause of action has already been

---

[7] The complaint mistakenly labels two claims as the pleading's fourth cause of action.

dismissed.  Mem. and Order dated Oct. 19, 2012, Docket Entry 63, at 10-11.  Each of the remaining claims is considered below.[8]

First, as a general matter, defendants are not entitled to summary judgment on grounds of immunity.  While qualified immunity "is not generally understood to protect officials from claims based on state law," a comparable state law doctrine does "grant government officials qualified immunity on state-law claims except where the officials' actions are undertaken in bad faith or without reasonable basis."  *Mangino v. Inc. Vill. of Patchogue*, 814 F. Supp. 2d 242, 250 n.5 (E.D.N.Y. 2011) (quoting *Jenkins v. City of New York*, 478 F.3d 76, 86 (2d Cir. 2007) and *Jones v. Parmley*, 465 F.3d 46, 63 (2d Cir. 2006)); *see also Blouin ex rel. Estate of Pouliot v. Spitzer*, 356 F.3d 348, 364 (2d Cir. 2004) (citing *Arteaga v. State*, 72 N.Y.2d 212, 216-17 (1988)) ("The New York courts recognize the defense of qualified immunity to shield the government official from liability unless [the official's] action is taken in bad faith or without a reasonable basis.").  The law governing New York's immunity doctrine "parallels federal qualified immunity jurisprudence."  *Gilliard v. City of New York*, 2013 WL 521529, at *12 n.11 (E.D.N.Y. Feb. 11, 2013).  Accordingly, for the reasons set forth above in connection with defendants' assertion of qualified immunity from suit under § 1983, defendants are not entitled to summary judgment on plaintiffs' state law claims on grounds of immunity.

Likewise, the discussion of plaintiff's Fourth Amendment rights above precludes summary judgment for defendants on plaintiff's state law claim for assault and battery, the fourth cause of action asserted in the complaint.  As United States District Judge Townes has already

---

[8] Defendants construe plaintiff's first cause of action as one brought against the City of New York for negligent hiring, training, retention and supervision, and argue in their motion papers that it should be dismissed.  City Mem. at 14.  Plaintiff's brief in opposition does not respond to this prong of defendants' motion.  Moreover, while the heading used in the complaint is not particularly informative, I understand plaintiff's first cause of action as one brought pursuant to § 1983, *see* Compl. ¶ 40, and Judge Townes has already granted defendants' motion to dismiss plaintiff's § 1983 claim against defendant City of New York, including plaintiff's claim for negligent hiring, training and supervision.  Mem. and Order dated Oct. 19, 2012, Docket Entry 63, at 9-10.

noted in this very case, "The same standard is used to evaluate claims of assault and battery under New York law and of excessive force under the Fourth Amendment." Mem. and Order of Oct. 19, 2012, Docket Entry 63, at 10 (citing *Biggs v. City of New York*, 2010 WL 4628360, at *8 (S.D.N.Y. Nov. 16, 2010)); *see also Mesa v. City of New York*, 2013 WL 31002, at *27 (S.D.N.Y. Jan. 3, 2013).

The second cause of action in plaintiff's complaint asserts a claim for negligence. Defendants seek dismissal of plaintiff's negligence claim on the ground that, having asserted a claim based on intentional conduct – the use of a taser – plaintiff may not simultaneously press a cause of action for negligence. As support, defendants cite *Morgan v. Nassau County*, 2009 WL 2882823, at *19 (E.D.N.Y. Sept. 2, 2009), where the Court noted that "New York has adopted the view that, once intentional offensive contact has been established, the actor is liable for assault and not negligence, even when the physical injuries may have been inflicted inadvertently." (internal quotations and citation omitted), and *Dineen v. Stramka*, 228 F. Supp. 2d 447 (S.D.N.Y. 2002).

The authorities cited by defendants are inapposite. The cited holding in *Morgan* involved a claim against a private actor who allegedly lunged at plaintiff, punched him and threw him against a window. 2009 WL 2882823, at *1, 19. No theory of negligence could plausibly apply to such alleged conduct. In *Dineen*, plaintiff's negligence claim was deemed abandoned, rendering the court's further discussion *dicta*. 228 F. Supp. 2d at 454. In any event, the evidence in this case, construed favorably to plaintiff, would allow a finder to conclude that defendants were negligent but not liable for assault and battery. For example, the evidence presented in connection with defendants' motion does not explain why Marchesona did not warn Morales before tasering him; a jury might find that Marchesona carelessly forgot to warn

Morales under the pressure of the circumstances he faced.  As another example, defendants suggested during oral argument that Pigott may not have known that an air mattress was on its way to the scene.  Tr. of Aug. 14, 2013, at 9.  A fact-finder might conclude that, absent knowledge that an air mattress would soon be available, it was reasonable to order that a taser be used, but might find as well that it was negligent for a supervising lieutenant not to be aware that an air mattress was expected to arrive shortly.  For these reasons, defendants' motion seeking dismissal of plaintiff's negligence claim is denied.

Defendants contend that plaintiff's third cause of action, for loss of enjoyment of life, is not cognizable under state law.  City Mem. at 16.  Plaintiff concedes as much, but also maintains that damages for loss of enjoyment of life may be awarded for a violation of § 1983.  Pl. Mem. at 19.  Assuming without deciding that plaintiff's position is correct, a claim of loss of enjoyment of life would be an element of damages recoverable under Section 1983 and not an independent cause of action.  Defendants' motion for summary judgment on plaintiff's third cause of action is therefore granted.

Plaintiff's fifth cause of action, erroneously labeled in the complaint as the fourth cause of action, is one for wrongful death.  Wrongful death is a statutory cause of action that may be brought by the personal representative

> of a decedent who is survived by distributees. . . to recover damages for a
> wrongful act, neglect or default which caused the decedent's death against a
> person who would have been liable to the decedent by reason of such wrongful
> conduct if death had not ensued.

N.Y. EPTL § 5-4.1.  Defendants argue that plaintiff's wrongful death claim should be dismissed if her assault and battery and negligence are dismissed.  Because I hold that the claims for negligence and assault and battery should survive defendants' motion, plaintiff's wrongful death claim should as well.

19

To prevail on a claim for wrongful death, a plaintiff must show "(1) the death of a human being; (2) a wrongful act, neglect or default of the defendant that caused the decedent's death; (3) the survival of distributees who suffered pecuniary loss by reason of the decedent's death; and (4) the appointment of a personal representative of the decedent." *Cerbelli v. City of New York*, 600 F. Supp. 2d 405, 429 (E.D.N.Y. 2009) (internal quotation marks omitted) (citing *Chong v. New York City Transit Auth.*, 83 A.D.2d 546 (2d Dep't 1981)).  Plaintiff Negron has been appointed the administrator of her son's estate, Compl. ¶ 45, and there is no genuine dispute about whether  plaintiff may establish the first and fourth elements.  Plaintiff has raised a question of fact for trial with respect to the second element as well, as I have denied defendants' motion for summary judgment with respect to plaintiff's claims for excessive force, assault and battery and negligence.  As to the third element, Negron is a presumptive distributee of Morales' estate; under New York law, when a decedent is not survived by a spouse or child but is survived by one or both parents, the parents are the sole distributees.  EPTL § 4-1.1.

Damages recoverable for wrongful death are limited to "fair and just compensation for the pecuniary injuries resulting from the decedent's death to the persons for whose benefit the action is brought," as well as "the reasonable expenses of medical aid, nursing and attention incident to the injury causing death and the reasonable funeral expenses of the decedent paid by the distributees."  EPTL § 5-4.3.  While it is unclear whether Negron will be able to demonstrate any pecuniary injuries due to loss of services,[9] she has adequately alleged that as a result of the

---

[9] It appears that Negron will face substantial difficulty establishing damages other than funeral expenses for wrongful death absent evidence that Morales was providing her with financial support.  "New York since its first wrongful death statute has steadfastly restricted recovery to 'pecuniary injuries,' or injuries measurable by money, and denied recovery for grief, loss of society, affection, conjugal fellowship and consortium." *Gonzalez v. New York City Hous. Auth.*, 77 N.Y.2d 663, 667-68 (1991).  Accordingly, the Appellate Division found an award to parents for the wrongful death of their son to be excessive because the decedent was a fifteen-year-old student who did not financially contribute to his household. *Regan v. Long Island R.R. Co.*, 128 A.D.2d 511, 513 (2d Dep't 1987).

wrongful death of her son, she was "obliged to incur funeral and other expenses," Compl. ¶ 76.

Accordingly, summary judgment on plaintiff's wrongful death claim is denied.

Plaintiff's complaint also asserts a separate claim on behalf of Negron herself for loss of

consortium.  More specifically, the claim labeled as the fifth cause of action alleges that plaintiff

"was permanently deprived of the services, society, love, affection, aid, maintenance,

companionship and contribution" of her son Morales.  *Id*. ¶ 82.  Defendants seek summary

judgment dismissing this claim on the ground that it is derivative of plaintiff's § 1983 cause of

action.  City Mem. 14-15.  Because the § 1983 claim survives summary judgment, plaintiff

Negron's loss of consortium claim does as well.

I do, however, question whether this claim is viable.  Under New York law, the parents of

a deceased child may not recover for loss of consortium, familial relationship, companionship, or

comfort that the child would have provided.  *Gilbert v. Stanton Brewery*, 295 N.Y. 270, 273

(1946) (finding that compensation to a mother for loss of companionship of her infant daughter

was "an improper element of damages"); *Devito v. Opatich*, 215 A.D.2d 714 (2d Dep't 1995)

(reversing damages award that included parents' "loss of their minor daughter's society which is

not compensable" and finding that there was insufficient showing for loss of services); *White v.

City of New York*, 37 A.D.2d 603, 603 (2d Dep't 1971) ("It was an error to permit an award to

the father for loss of his child's companionship. . . . The loss of a child's society is not

compensable."); *see also Beyer v. Murray*, 33 A.D.2d 246, 248 (4th Dep't 1970) (citing *Gilbert*);

*Foti v. Quittel*, 19 A.D.2d 635 (2d Dep't 1963) (citing *Gilbert*).  However, because defendants

did not move for summary judgment on this basis and plaintiff has therefore not had an

opportunity to address the issue, I decline to grant defendants' motion for summary judgment

dismissing Negron's loss of consortium claim on this ground.

## CONCLUSIONS

For all of the reasons stated above, defendants' motion for summary judgment with respect to plaintiff's third cause of action, claiming loss of enjoyment of life, is GRANTED. Defendants' motion for summary judgment is in all other respects DENIED.


SO ORDERED.

_____/s/_____

Steven M. Gold
United States Magistrate Judge

Brooklyn, New York
October 4, 2013


*U:\DFM 2012-2013\Negron\Negron SJ final 100413.docx*